Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Tel: 218-464-0539
Email: mfink@biologicaldiversity.org
*Applicant Pro Hac Vice*

Brian Segee (Cal. Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Tel: 805-750-8852
Email: bsegee@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity; and Maricopa Audubon Society, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. Bureau of Land Management; and U.S. Fish and Wildlife Service, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiffs Center for Biological Diversity and Maricopa Audubon Society (collectively, "the Center") challenge Defendants' United States Bureau of Land Management ("BLM") and United States Fish and Wildlife Service ("FWS") ongoing failure to adequately protect and conserve numerous threatened and endangered species that are being harmed by livestock grazing within the Gila Box Riparian National Conservation Area ("Gila Box RNCA") in Arizona, in violation of the Endangered Species Act ("ESA"), including the desert pupfish, Gila chub, Gila topminnow, loach minnow, spikedace, and yellow-billed cuckoo.

2.      More specifically, the Center challenges the ongoing failure of the BLM and FWS to reinitiate and complete ESA Section 7 consultation regarding the ongoing impacts of livestock grazing on the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments, within the Gila Box RNCA, on threatened and endangered species and their critical habitat.

3.      The Center seeks declaratory relief that the BLM and FWS are in ongoing violation of the ESA for failing to reinitiate and complete ESA consultation on the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments.  The Center also seeks injunctive relief to ensure adequate interim protection for the threatened and endangered species, and their critical habitat, until the BLM and FWS are in full compliance with the ESA.

4. The Center also challenges the BLM's ongoing failure to timely respond to the Center's March 3, 2021 and May 24, 2021 Freedom of Information Act ("FOIA") requests, regarding livestock grazing and endangered species within the Gila Box RNCA, and provide the responsive records to the Center, in violation of FOIA.

**JURISDICTION**

5. Jurisdiction is proper in this Court under 28 U.S.C. § 1331; 28 U.S.C. § 1346; and 16 U.S.C. § 1540(g) because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA, 16 U.S.C. §§ 1531 *et seq*., and FOIA, 5 U.S.C. §§ 552. The Center provided Defendants with notice of its intent to file suit pursuant to the ESA citizen suit provision. 16 U.S.C. § 1540(g)(2). An actual justiciable controversy exists between the Center and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202; 5 U.S.C. § 552; and 16 U.S.C. § 1540(g).

**VENUE**

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A), because Defendants BLM and FWS have offices in the district, a substantial part of the events, omissions, and violations giving rise to the Center's claims occurred in the district, and the Center resides in the district.

7. Venue is proper in the Tucson Division because the Gila Box RNCA is located in Graham and Greenlee counties in southeastern Arizona. LRCiv 77.1(a).

3

**PARTIES**

8.      Plaintiff Center for Biological Diversity is a non-profit corporation headquartered in Tucson, Arizona, with offices in a number of states and Mexico.  The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in endangered species and habitat protection issues nationwide.  The Center has over 89,000 members throughout the United States and the world, including staff and members within Arizona.

9.      The Center for Biological Diversity has a long history of working to protect and conserve the many threatened and endangered species that are located on and depend on federal lands within Arizona.  This includes submitting petitions under Section 4 of the ESA to compel FWS to designate species as threatened or endangered, and to designate their critical habitat.  This also includes working to ensure adequate protection for these species and habitats from federal agency actions, including from livestock grazing on federal lands.

10.      The Center for Biological Diversity brings this action on its own behalf, and on behalf of its members who derive aesthetic, recreational, inspirational, spiritual, scientific, and educational benefits from the Gila Box RNCA, including the areas and habitat where threatened and endangered species may be found.  The Center's members who regularly use and enjoy the Gila Box RNCA include, but are not limited to, Chris Bugbee, Robin Silver, and Todd Schulke.

11.     The Center for Biological Diversity's members, including but not limited to Chris Bugbee, Robin Silver, and Todd Schulke, use and enjoy the Gila Box RNCA for a variety of purposes, including hiking, camping, photographing scenery and wildlife, viewing wildlife and signs of wildlife, and engaging in other scientific and recreational activities.  The areas of the Gila Box RNCA that the Center's members use and enjoy include specific areas where threatened and endangered species may be found.  The Center's members' use and enjoyment of these areas is significantly enhanced knowing that these threatened and endangered species are still likely to be present in these areas.

12.     The Center for Biological Diversity's members, including Chris Bugbee, Robin Silver, and Todd Schulke, intend to continue to use and enjoy the Gila Box RNCA frequently and on an ongoing basis in the future, including during the fall and winter of 2021-22.  The areas of the Gila Box RNCA that the Center's members intend to continue to use and enjoy include specific areas where threatened and endangered species are likely to be found.  The aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of the Center's members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and FOIA continue.  These are actual, ongoing, concrete injuries caused by Defendants' violations of the ESA and FOIA.  The relief sought will redress these injuries.

13.     Plaintiff Maricopa Audubon Society is a non-profit organization dedicated to the enjoyment of riparian wildlife and plant species with a primary focus on the protection and restoration of southwestern riparian habitat through fellowship, education,

and community involvement.  Maricopa Audubon is a chapter of the National Audubon Society.  Maricopa Audubon has over 2,300 members, primarily in central Arizona, including Robin Silver, who also works on its board.

14.  Maricopa Audubon Society has undertaken ongoing efforts to protect habitats for imperiled species throughout the arid southwest. Maricopa Audubon has played a strong role in protecting endangered and threatened species in the southwest through public education efforts, field surveys, public field trips, and position papers. Maricopa Audubon has been intimately involved in riparian protection efforts throughout the southwest since the mid-1970s.  For example, on February 2, 1998, Maricopa Audubon was a petitioner with the Center for Biological Diversity for federal endangered species listing protection for the southwestern yellow-billed cuckoo.  This action resulted in designation of the cuckoo as threatened by the U.S. Fish and Wildlife Service on October 3, 2014.  In addition, Maricopa Audubon conducts field trips with members of the organization and non-members from the general public to critical habitat areas of species listed under the ESA, including the cuckoo.

15.  Maricopa Audubon Society brings this action on behalf of itself and its adversely affected members, including but not limited to Robin Silver.  The educational, scientific, aesthetic, conservation, and recreational interests of Maricopa Audubon's members within the Gila Box RNCA, including Robin Silver, have been and continue to be harmed.  Maricopa Aububon's members intend to continue using and enjoying the Gila Box RNCA, including this fall and winter.  Unless the Court grants the requested

relief, Maricopa Audubon's members will continue to be adversely affected and irreparably injured by Defendants' failures to comply with the law.  The requested relief would redress these injuries.

16.    Defendant U.S. Bureau of Land Management ("BLM") is an agency within the U.S. Department of the Interior.  It and its officers are responsible for the lawful management of the Gila Box RNCA.

17.    Defendant U.S. Fish and Wildlife Service ("FWS") is an agency within the U.S. Department of the Interior.  It and its officers are responsible for administering the ESA, particularly regarding potential impacts to wildlife and fish species that have been listed as threatened or endangered with extinction pursuant to the ESA.

## LEGAL BACKGROUND

### I.    The Endangered Species Act

18.    Congress enacted the ESA in 1973 to provide "a program for the conservation of . . . endangered species and threatened species."  16 U.S.C. § 1531(b). Section 2(c) of the ESA establishes that it is the policy of Congress that all federal agencies shall seek to conserve threatened and endangered species, and shall utilize their authorities in furtherance of the purposes of the ESA.  16 U.S.C. § 1531(c)(1).

19.    The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3).

7

20.     Section 4 of the ESA directs the Secretary of the Interior to list species that are threatened or endangered with extinction, and to designate "critical habitat" for such species.  16 U.S.C. § 1533(a).  "Critical habitat" is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations.  16 U.S.C. § 1532(5)(A).

21.     Section 7(a)(2) of the ESA requires each federal agency, in consultation with FWS, to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).  "Action" is broadly defined to include all activities or programs of any kind authorized, funded, or carried out by federal agencies, including actions directly or indirectly causing modifications to the land, water, or air; and actions intended to conserve listed species or their habitat.  50 C.F.R. § 402.02.

22.     During Section 7 consultation, both the action agency and FWS must use the best scientific data available.  16 U.S.C. § 1536(a)(2).

23.     For each proposed action, the action agency must request from FWS whether any listed or proposed species may be present in the area of the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c).  If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

24.     If the action agency determines that its proposed action may affect any listed species or critical habitat, the agency must engage in "formal consultation" with FWS.  50 C.F.R. § 402.14(a). To complete formal consultation, FWS must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or critical habitat.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(h).

25.     If FWS concludes in the biological opinion that the proposed action is likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, FWS must outline "reasonable and prudent alternatives" to the proposed action that FWS believes would not jeopardize listed species or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

26.     If FWS concludes in the biological opinion that the proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement" along with the biological opinion, specifying the amount or extent of such incidental taking on the species, any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the action agency to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

27.     The reinitiation of formal consultation under the ESA is required and must be requested by FWS or the action agency where discretionary federal involvement or

control over the action has been retained or is authorized by law, and if (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16(a).

28.     After the initiation or reinitiation of consultation, the action agency is prohibited from making any irreversible or irretrievable commitment of resources with respect to the action which may foreclose the formulation or implementation of any reasonable and prudent alternative measures.  16 U.S.C. § 1536(d).

29.     Section 9 of the ESA and its implementing regulations prohibit the unauthorized "take" of any endangered or threatened species of fish or wildlife.  16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31.  "Take" is defined broadly to include harming, harassing, trapping, capturing, wounding or killing a protected species either directly or by degrading its habitat.  16 U.S.C. § 1532(19).  Taking that is in compliance with the terms and conditions of an ITS in a biological opinion is exempt from the Section 9 take prohibition.  16 U.S.C. § 1536(o)(2).

## II.    The Freedom of Information Act

30.    The purpose of the Freedom of Information Act ("FOIA") is government transparency.  FOIA establishes the public's right to access all federal agency records unless such records may be withheld pursuant to one of nine, narrowly construed exemptions.  5 U.S.C. § 552(b)(1)-(9).

31.    FOIA imposes strict deadlines on federal agencies.  Within 20 working days of receiving a FOIA request, an agency must determine whether to disclose responsive records and notify the requester of its determination, and it must then make records "promptly" available unless it can establish that certain unusual circumstances are present and/or that it may lawfully withhold records, or portions thereof, from disclosure.  5 U.S.C. § 552(a)(3)(A), (a)(6).  Also within 20 working days, the agency must inform the requester that it has a right to appeal the agency's determination.  *Id.* § 552(a)(6)(A)(i).

32.    FOIA places the burden on the agency to prove that it may withhold responsive records from a requester.  5 U.S.C. § 552(a)(4)(B).

33.    Congress has specified limited circumstances in which federal agencies may obtain more time to make the determination that is required by 5 U.S.C. § 552(a)(6)(A)(i).

34.    First, an agency may toll the 20-working-day deadline to seek additional information or clarification from a requester, but that tolling period ends when the agency receives such information or clarification.  5 U.S.C. § 552(a)(6)(A).

35. Second, an agency may extend the 20-working-day deadline for an additional 10 working days by providing written notice to the requester that sets forth "unusual circumstances" to justify a deadline extension, and also providing the date by which the agency expects to make the determination. 5 U.S.C. § 552(a)(6)(B)(i). To invoke such "unusual circumstances," the agency must provide the requester with "an opportunity to limit the scope of the request so that it may be processed within [20 working days] or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request." *Id.* § 552(a)(6)(B)(ii).

36. FOIA requires each agency to make reasonable efforts to search for records in a manner that is reasonably calculated to locate all records that are responsive to the FOIA request. 5 U.S.C. § 552(a)(3)(C)-(D).

37. FOIA requires federal agencies to expeditiously disclose requested records, *see* 5 U.S.C. § 552, and mandates a policy of broad disclosure of government records. Any inquiry under FOIA brings with it a strong presumption in favor of disclosure.

38. Congress recognized that in certain, limited instances, records may be withheld as exempt from FOIA's broad disclosure mandate, and thus it created nine categories of exemptions. 5 U.S.C. § 552(b). These exemptions, however, must be narrowly construed in light of FOIA's objective of disclosure, not secrecy.

39. United States district courts have jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

1

2

**FACTUAL BACKGROUND**

**I.     The Gila Box Riparian National Conservation Area**

3

4          40.     The Arizona Desert Wilderness Act of 1990 established the Gila Box

5

6    Riparian National Conservation Area ("RNCA").  The Gila Box RNCA includes four

7    perennial waterways, the Gila and San Francisco rivers and Bonita and Eagle creeks.

8    The Gila Box RNCA was established in order to conserve, protect, and enhance its

9    riparian and associated areas, and the aquatic, wildlife, archaeological, paleontological,

10

11   scientific, cultural, recreational, educational, scenic, and other resources and values of

12   such areas.  16 U.S.C. § 460ddd(a).

13

14   

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41.     The Gila Box RNCA consists of scenic, steep-walled desert canyons surrounding perennial rivers and creeks, and is one of the most significant riparian zones in the southwest.

42.     The BLM was required to develop a comprehensive management plan for the Gila Box RNCA.  16 U.S.C. § 460ddd(g).  The BLM completed the Gila Box RNCA Management Plan in 1998.

43.     The Gila Box RNCA Management Plan directs that livestock will be deferred from the riparian areas within the RNCA for the life of the Plan.  According to the Plan, this deferment of grazing best meets the statutory mandate to conserve, protect, and enhance the riparian areas, and provides the best protection for natural and cultural resources.

44.     Pursuant to the Gila Box RNCA Management Plan, riparian corridors may only be used on a very limited basis to trail livestock as part of pasture rotations that are implemented to achieve RNCA management goals and objectives.

45.     Pursuant to the Gila Box RNCA Management Plan, the BLM must work closely with livestock operators to remove livestock and repair fencing as quickly as possible when incidental trespasses occur.

46.     The Gila Box RNCA Management Plan requires the BLM to monitor populations and habitats of threatened and endangered species.  This includes population estimate surveys for Gila chub within lower Bonita Creek, in order to determine the population stability and viability in the upper and lower reaches of the creek.

47.     For the Johnny Creek allotment, the Gila Box RNCA Management Plan prohibits livestock use in the riparian area along Bonita Creek.

48.     For the Bonita Creek allotment, the Gila Box RNCA Management Plan prohibits livestock use within the riparian areas along Bonita Creek and the Gila River. Grazing was required to be discontinued on approximately 1,900 acres of upland habitat until fencing was constructed that would exclude livestock from Bonita Creek.

49.     For the Bull Gap allotment, the Gila Box RNCA Management Plan prohibits livestock use within the riparian areas along Bonita Creek and the Gila River.

50.     For the Gila and Morenci allotments, the Gila Box RNCA Management Plan prohibits livestock use on public land in the riparian areas along the Gila River.

51.     For the Zorilla allotment, the Gila Box RNCA Management Plan requires a quarter mile of fence to exclude livestock from accessing the Gila River.

**II.     The 2012 Biological Opinion on the Gila District Livestock Grazing Program**

52.     On May 21, 2012, FWS issued the "Biological Opinion on the Gila District Livestock Grazing Program" ("2012 Biological Opinion").  The 2012 Biological Opinion covered three previous livestock grazing consultations: (1) the programmatic biological opinion for the Safford/Tucson Field Offices' livestock grazing program; (2) the biological opinions for the Phoenix District Portion of the Eastern Arizona Grazing EIS and the Upper Gila-San Simon Grazing EIS; and (3) the biological opinion for livestock grazing on 18 allotments along the Middle Gila River Ecosystem.

53.     The BLM's management of the Gila Box RNCA, including the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments, is included within the 2012 Biological Opinion.

54.     FWS acknowledges within the 2012 Biological Opinion that livestock grazing can adversely affect watersheds that support the aquatic and riparian habitats in which threatened and endangered fish occur.  For instance, trampling by livestock can alter vegetation composition, increase erosion and sedimentation into streams, and increase flood events.  Grazing can promote invasion by non-native plant species. Livestock trample and destroy cryptobiotic crusts, which help stabilize soils and provide soil nutrients.  In extreme situations, these actions can decrease or extirpate populations from specific areas.

55.     The 2012 Biological Opinion includes a number of "conservation measures," which the BLM must implement in order to reduce the adverse effects to threatened and endangered species, and critical habitat, from livestock grazing.  The general conservation measures, which were required to be implemented for all livestock grazing actions, include (1) submitting an annual monitoring report to FWS, summarizing for the previous year the implementation and effectiveness of the measures and documenting incidental take; (2) working to remove unauthorized livestock from excluded areas, including contacting the owner of the livestock as soon as possible after the unauthorized use of livestock is reported and request removal; (3) working as quickly as practical to repair exclosure fences or notify permittees to repair fences; and (4)

inspecting fences that are used for excluding livestock from BLM managed riparian areas before livestock are turned out.

56.     For threatened and endangered fish, the 2012 Biological Opinion includes additional conservation measures, including requiring the BLM to monitor, at least annually, (1) aquatic habitat variables, riparian vegetation, and streambanks as they relate to livestock management and unauthorized livestock use; and (2) the populations of Gila topminnow, desert pupfish, loach minnow, spikedace, Little Colorado spinedace, and Gila chub.

57.     For the desert pupfish and Gila topminnow, the 2012 Biological Opinion includes additional conservation measures, including requiring the BLM to ensure the timely repair and maintenance of structures required to maintain aquatic ecosystem function.

58.     The Bonita Creek, Johnny Creek, and Bull Gap Allotments border or include portions of Bonita Creek.

59.     According to the 2012 Biological Opinion, the desert pupfish, Gila chub, Gila topminnow, loach minnow, and spikedace are found within Bonita Creek.

60.     The Gila River is likely occupied by the razorback sucker, and Bonita Creek is possibly occupied by the sucker.

61.     FWS states in the 2012 Biological Opinion that grazing has been excluded from all riparian areas administered by the BLM within the Bonita Creek, Johnny Creek,

17

and Bull Gap Allotments, with the exception that the BLM authorizes annual livestock drives down the riparian corridor on the Bonita Creek Allotment.

62.     FWS concluded in the 2012 Biological Opinion that the BLM's grazing program is not likely to jeopardize the continued existence of any listed species, and is not likely to destroy or adversely modify any critical habitat.

63.     For the desert pupfish, FWS based it's no jeopardy and no adverse modification determination in part on the fact that (1) few or no direct effects to the pupfish were expected in the Johnny Creek or Bull Gap Allotments because pupfish populations are within livestock exclosures or livestock is not currently proposed on the allotment; (2) few direct effects were anticipated in the Bonita Creek Allotment because only trailing once or twice per year would occur through Bonita Creek; (3) pupfish populations are protected from grazing; and (4) conservation measures will be implemented, including maintaining exclosures and having livestock removed from exclosures as soon as possible.

64.     For the Gila chub, FWS based it's no jeopardy and no adverse modification determination in part on the fact that (1) few or no direct effects to the chub were expected in the Bonita Creek Allotment because current populations are inaccessible to livestock because of topography or exclosures; and (2) few direct effects were anticipated in the Bonita Creek Allotment because the only grazing activities in the stream were from trailing through Bonita Creek once or twice per year.

65.    For the Gila topminnow, FWS based it's no jeopardy and no adverse modification determination in part on the fact that (1) few direct effects to the topminnow were expected in the Johnny Creek or Bull Gap Allotments because current populations are inaccessible to livestock; (2) few direct effects were anticipated in the Bonita Creek Allotment because only trailing once or twice per year would occur through Bonita Creek; (3) topminnow populations are protected from grazing; and (4) conservation measures will be implemented, including having livestock removed from exclosures as soon as possible.

66.    For the loach minnow, FWS based it's no jeopardy and no adverse modification determination in part on the fact that (1) few or no direct effects to the loach minnow were expected because the populations are excluded from livestock, the allotment does not have livestock, or only trailing once or twice a year would occur; and (2) conservation measures will be implemented, including having livestock removed from exclosures as soon as possible.

67.    For the spikedace, FWS based it's no jeopardy and no adverse modification determination in part on the fact that (1) few or no direct effects to the spikedace were expected because the populations are excluded from livestock, the allotment does not have livestock, or only trailing once or twice a year would occur; and (2) conservation measures will be implemented, including having livestock removed from exclosures as soon as possible.

68.     For the razorback sucker, FWS based it's no jeopardy and no adverse modification determination in part on the fact that the BLM will implement actions that eliminate or reduce the adverse effects to the sucker and its critical habitat, such as exclusions, seasonal restrictions, and other actions that minimize livestock use along and near the water.

69.     FWS determined in the 2012 Biological Opinion that the incidental take of Gila chub is not reasonably certain to occur in the Bonita Creek Area because the areas that have chub now or in the future are excluded from livestock grazing and trailing of livestock would take place only once or twice a year across the creek and in a very small portion of the creek.

70.     FWS determined in the 2012 Biological Opinion that the incidental take of loach minnow and spikedace is not reasonably certain to occur in Bonita Creek from livestock use or trailing because grazing is not permitted in the creek, and trailing will take place infrequently and in a very small portion of the creek.

71.     The Gila River, within the Gila Box RNCA and within the Zorilla, Gila, Morenci, Bull Gap, and Bonita Creek Allotments, has been formally designated by FWS as critical habitat for the yellow-billed cuckoo.

**III.    New information reveals effects of livestock grazing on the Gila Box RNCA in a manner and to an extent not considered in the 2012 Biological Opinion.**

72.     Between April 21 and June 1, 2021, staff of the Center for Biological Diversity conducted field surveys of approximately 20 miles of habitat along the Gila River and its tributaries within the Gila Box RNCA.

73.   The Center's surveys documented cattle throughout the Gila Box RNCA, including in major tributaries such as Bonita Creek.  The Center's surveys documented numerous cows and cattle grazing damage along riparian corridors that were supposed to be protected from grazing.

74.   The Center's surveys found that FWS' assumption in the 2012 Biological Opinion that livestock impacts would be limited in Bonita Creek to only biannual crossings is not accurate.

75.   Within the Bonita Creek Allotment, the Center's surveys found that cattle impacts increased in severity and frequency along Bonita Creek as the surveyors moved upstream towards the San Carlos Apache Reservation.  Cattle trails were found through the survey area, including onto the Johnny Creek Allotment.  In numerous areas within the Bonita Creek Allotment, riparian habitat was heavily browsed, cattle feces polluted the water, shorelines were trampled, and soils were barren and compacted.

76.   Within the Zorilla Allotment, the Center's surveys found that streambanks and uplands along the Gila River were nearly completely severely degraded and damaged.  There was little grass remaining along the Gila River.  And there was no functional boundary fencing between the Zorilla and Gila Allotments, as cattle trails passed throughout the area.

77.   Within the Gila Allotment, the Center's surveys found that large swaths of riparian habitat were denuded and devoid of grass and understory vegetation.  Chronic

21

and acute cattle grazing impacts indicated a sustained cattle presence.  Streambanks were chiseled and shorelines were heavily trampled and degraded.

78.     Within the Morenci Allotment, the Center's surveys found many more miles of barren understory and degraded riverbanks.

79.     Within the Bull Gap Allotment, the Center's surveys found widespread areas of severely damaged streamside and upland habitat.  The surveyors found huge swaths of bare soil with dust bowl-like conditions.

80.     Along Bonita Creek, the Center's surveys found that there was a seamless movement of cattle between private and BLM lands, without the required protective boundary fencing to protect the BLM lands.

81.     Along the Gila River, in proximity to the intersection between the Twin C, Bull Gap, Tollgate and Bonita Creek allotments, the Center documented severe cattle impacts similar to other heavily damaged Gila Box RNCA areas. This area is not within a designated allotment but is also being heavily damaged by grazing.

82.     The following are a sampling of images taken by Center staff during the surveys between April 21 to June 1, 2021 at the Gila Box RNCA.  Numerous additional images were included and provided to the agencies within the Center's notice letter.



Severe grazing, ground compaction and bank degradation by along Bonita Creek within GBRNCA, 33.042306, -109.561711, June 1, 2021.

A cow along Bonita Creek, 33.044788, -109.560799, June 1, 2021.

1

2

3

4

5

6

7

8

9

10

11



12   Cows along Bonita Creek on the Johnny Creek Allotment, 33.010108, -109.553535, May

13   31, 2021.

14

15

16

17

18

19

20

21

22

23

24

25   Cattle feces and denuded streamside habitat along the Gila River on the Zorilla Allotment,

26   32.964801, -109.322019, April 21, 2021.

27

28

1
2
3
4
5
6
7
8
9
10
11



12  Streambank trampling and degradation caused by cattle grazing on the Zorilla Allotment,
13  32.966205, -109.312663, April 21, 2021.

14
15
16
17
18
19
20
21
22
23
24



25  Trampling and streambank degradation impacting willow seedlings along the Gila River
26  on the Gila Allotment, 32.972803, -109.35173, April 22, 2021.
27
28

25

**IV.     A new species has been listed, and critical habitat designated, that may be adversely affected by livestock grazing on the Gila Box RNCA.**

83.     Subsequent to the 2012 Biological Opinion, on October 3, 2014, FWS designated the western yellow-billed cuckoo as a threatened species under the ESA.  79 Fed. Reg. 59,992 (Oct. 3, 2014).

84.     On April 21, 2021, FWS designated critical habitat for the western yellow-billed cuckoo.  86 Fed. Reg. 20,798 (April 21, 2021).

85.     The western yellow-billed cuckoo is found within the Gila Box RNCA. Designated critical habitat for the western yellow-billed cuckoo is found within the Gila Box RNCA.

86.     Ongoing livestock grazing on the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments, within the Gila Box RNCA, may adversely affect the western yellow-billed cuckoo and its designated critical habitat.

87.     FWS did not consider or address within the 2012 Biological Opinion the potential adverse impacts of livestock grazing within the Gila Box RNCA on the western yellow-billed cuckoo or its critical habitat.

**V.     The Center's ESA Notice Letter**

88.     On July 21, 2021, the Center sent a detailed sixty-day notice letter to the Secretary of Interior, FWS, and the BLM, identifying the ESA violations included in this Complaint, pursuant to the citizen suit provision of the ESA.  16 U.S.C. § 1540(g).

89.     More than sixty days has passed since Defendants' receipt of the notice letter.  Defendants have not responded to the notice letter.

**VI.    The Center's March 3, 2021 and May 24, 2021 Freedom of Information Act ("FOIA") Requests**

90.    On March 3, 2021, the Center submitted a request for records to the BLM pursuant to FOIA. The Center requested records regarding the Gila Box RNCA, including but not limited to annual monitoring reports, allotment management plans, wildlife reports and analysis, consultations, and records concerning trespass and unauthorized livestock.

91.    On May 24, 2021, the Center submitted another request for records to the BLM pursuant to FOIA.  The Center requested records related to the Bonita Creek Allotment, within the Gila Box RNCA, including the allotment management plan, operating instructions, and drought instructions.

92.    The Center sent emails to the BLM to inquire about the status of the March 3, 2021 FOIA request and the May 24, 2021 FOIA request.  The Center sent letters to the BLM, notifying the agency that it is in violation of FOIA concerning the Center's March 3, 2021 FOIA request and the May 24, 2021 FOIA request.

93.    At this time, the BLM has not provided any records to the Center in response to the March 3, 2021 FOIA request, or the May 24, 2021 FOIA request.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**

<u>The BLM and FWS are in Ongoing Violation of the ESA for Failing to Reinitiate and Complete Consultation on the Ongoing Impacts of the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments within the Gila Box RNCA</u>

94.    The Center incorporates by reference all preceding paragraphs.

95.    Section 7 of the ESA requires the BLM to consult with FWS to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the

continued existence of any threatened or endangered species, or result in the destruction or adverse modification of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).

96.     The reinitiation of consultation is required and must be requested by FWS or the BLM where discretionary federal involvement or control over the action has been retained or is authorized by law, and if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered, the action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion, or a new species is listed or critical habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16(a).

97.     The BLM and FWS have violated and remain in ongoing violation of the ESA by failing to reinitiate and complete consultation on the impacts of livestock grazing on the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments within the Gila Box RNCA despite significant new information and newly listed species and critical habitat revealing that livestock grazing on the Allotments has adversely affected, and will continue to adversely affect, threatened and endangered species and their critical habitat in a manner and to an extent not considered within the 2012 Biological Opinion.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a).

98.     The ongoing failure of the BLM and FWS to reinitiate and complete consultation on the ongoing impacts of the Bonita Creek, Johnny Creek, Zorilla, Gila,

28

Morenci, and Bull Gap Allotments on threatened and endangered species, and critical habitat, violates the ESA.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a).

99.     In the absence of the required reinitiated consultation, the BLM is in ongoing violation of its obligation under Section 7 of the ESA to ensure that its actions are not likely to jeopardize the continued existence of the numerous threatened and endangered species assessed in the 2012 Biological opinion, including the desert pupfish, Gila chub, Gila topminnow, loach minnow, spikedace, and yellow-billed cuckoo or result in the destruction or adverse modification of any designated critical habitat.  16 U.S.C. § 1536(a)(2).

## SECOND CLAIM FOR RELIEF

<u>The BLM Violated FOIA by Failing to Provide a Timely or Adequate Determination regarding the Center's March 3, 2021 FOIA Request</u>.

100.    The Center incorporates by reference all preceding paragraphs.

101.    The Center has a statutory right to have BLM process its FOIA requests in a manner that complies with FOIA.  5 U.S.C. § 552(a)(3).

102.    The Center's rights in this regard were violated when BLM unlawfully delayed the response to the Center's March 3, 2021 FOIA request beyond the determination deadlines imposed by FOIA.  5 U.S.C. § 552(a)(6)(A)(i), (ii).

103.    BLM has failed to make an adequate and timely determination because the statutory deadline of 20 days has passed and BLM has failed to inform the Center whether it plans to comply with the FOIA requests; when the Center may anticipate receiving a full response (an estimated completion date) to the requests, and if not, the

reasons for which it is denying the requests; the volume of records denied; and how the Center may appeal.  5 U.S.C. § 552(a)(6)(A)(i).

104.    BLM has failed to notify the Center of any "unusual circumstances" in a notice that also set forth a date on which the determination was expected to be dispatched within ten working days of the statutory 20-day deadline, as required by FOIA.  5 U.S.C. § 552(a)(6)(B)(i).

105.    BLM has further violated FOIA by unlawfully failing to undertake a search reasonably calculated to locate all records that are responsive to the Center's March 3, 2021 FOIA request.  5 U.S.C. § 552(a)(3)(C)-(D).

106.    BLM has further violated FOIA by refusing to promptly disclose records responsive to the Center's March 3, 2021 FOIA request.  5 U.S.C. § 552.

107.    The Center has a statutory right to the records it seeks and there is no legal basis for BLM to assert that any of FOIA's nine exemptions to mandatory disclosure apply to withhold these records from the Center.  *See* 5 U.S.C. § 552(b)(1)-(9).  To the extent BLM is claiming any of these exemptions, BLM is unlawfully withholding from disclosure records that are responsive to the Center's March 3, 2021 FOIA request.

108.    The Center has a statutory right to any reasonably segregable portion of a record that may contain information lawfully subject to any of FOIA's exemptions.  5 U.S.C. § 552(b).  BLM is violating the Center's rights in this regard to the extent it is unlawfully withholding reasonably segregable portions of any lawfully exempt records that are responsive to the Center's March 3, 2021 FOIA request.

109.    Based on the nature of the Center's organizational activities, it will undoubtedly continue to employ FOIA's provisions in record requests BLM in the foreseeable future.  The Center's organizational activities will be adversely affected if BLM can continue violating FOIA's disclosure provisions as it has in this case.  Unless enjoined and made subject to a declaration of the Center's legal rights by this Court, BLM will continue to violate the Center's right to receive public records under FOIA.

**THIRD CLAIM FOR RELIEF**

The BLM Violated FOIA by Failing to Provide a Timely or Adequate Determination regarding the Center's May 24, 2021 FOIA Request.

110.    The Center incorporates by reference all preceding paragraphs.

111.    The Center has a statutory right to have BLM process its FOIA requests in a manner that complies with FOIA.  5 U.S.C. § 552(a)(3).

112.    The Center's rights in this regard were violated when BLM unlawfully delayed the response to the Center's May 24, 2021 FOIA request beyond the determination deadlines imposed by FOIA.  5 U.S.C. § 552(a)(6)(A)(i), (ii).

113.    BLM has failed to make an adequate and timely determination because the statutory deadline of 20 days has passed and BLM has failed to inform the Center whether it plans to comply with the FOIA requests; when the Center may anticipate receiving a full response (an estimated completion date) to the requests, and if not, the reasons for which it is denying the requests; the volume of records denied; and how the Center may appeal.  5 U.S.C. § 552(a)(6)(A)(i).

31

114.   BLM has failed to notify the Center of any "unusual circumstances" in a notice that also set forth a date on which the determination was expected to be dispatched within ten working days of the statutory 20-day deadline, as required by FOIA.  5 U.S.C. § 552(a)(6)(B)(i).

115.   BLM has further violated FOIA by unlawfully failing to undertake a search reasonably calculated to locate all records that are responsive to the Center's May 24, 2021 FOIA request.  5 U.S.C. § 552(a)(3)(C)-(D).

116.   BLM has further violated FOIA by refusing to promptly disclose records responsive to the Center's May 24, 2021 FOIA request.  5 U.S.C. § 552.

117.   The Center has a statutory right to the records it seeks and there is no legal basis for BLM to assert that any of FOIA's nine exemptions to mandatory disclosure apply to withhold these records from the Center.  *See* 5 U.S.C. § 552(b)(1)-(9).  To the extent BLM is claiming any of these exemptions, BLM is unlawfully withholding from disclosure records that are responsive to the Center's May 24, 2021 FOIA request.

118.   The Center has a statutory right to any reasonably segregable portion of a record that may contain information lawfully subject to any of FOIA's exemptions.  5 U.S.C. § 552(b).  BLM is violating the Center's rights in this regard to the extent it is unlawfully withholding reasonably segregable portions of any lawfully exempt records that are responsive to the Center's May 24, 2021 FOIA request.

119.   Based on the nature of the Center's organizational activities, it will undoubtedly continue to employ FOIA's provisions in record requests BLM in the

foreseeable future.  The Center's organizational activities will be adversely affected if BLM can continue violating FOIA's disclosure provisions as it has in this case.  Unless enjoined and made subject to a declaration of the Center's legal rights by this Court, BLM will continue to violate the Center's right to receive public records under FOIA.

**RELIEF REQUESTED**

WHEREFORE, the Center respectfully requests that this Court:

A.     Declare that the BLM and FWS are in ongoing violation of the ESA for failing to reinitiate and complete consultation on the ongoing impacts of livestock grazing on the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments within the Gila Box RNCA;

B.     Order the BLM and FWS to promptly reinitiate and complete ESA consultation on the ongoing impacts of livestock grazing on the Bonita Creek, Johnny Creek, Zorilla, Gila, Morenci, and Bull Gap Allotments on threatened and endangered species and critical habitat;

C.     Order the BLM to take the actions necessary to prevent any further adverse impacts to threatened and endangered species, and critical habitat, within the Gila Box RNCA, until the BLM and FWS can demonstrate full compliance with the ESA;

D.     Declare that the BLM's failure to provide the Center with timely and full responses to the Center's March 3, 2021 and May 24, 2021 FOIA requests, including its failure to make timely determinations and produce all records requested, is in violation of FOIA, 5 U.S.C. § 552(a)(6);

E.    Declare that the BLM's failure to timely undertake a search for and disclose to the Center all records responsive to the Center's March 3, 2021 and May 24, 2021 FOIA requests, as alleged above, are unlawful under FOIA, 5 U.S.C. § 552(a)(6)(A)(i);

F.    Order the BLM to conduct searches reasonably calculated to locate all records responsive to the Center's March 3, 2021 and May 24, 2021 FOIA requests, utilizing a cut-off date for such searches that is the date the searches are conducted;

G.    Order the BLM to provide the Center, by a date certain, with all responsive records and reasonably segregable portions of lawfully exempt records sought in this action;

H.    Award to the Center its costs, expenses, expert witness fees, and reasonable attorney fees pursuant to applicable law including the ESA, 16 U.S.C. § 1540(g) and FOIA, 5 U.S.C. § 552(a)(4)(E); and

I.    Grant the Center such further relief as may be just, proper, and equitable.

Dated October 7, 2021.          Respectfully submitted,

*/s/ Marc D. Fink*
Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Tel: 218-464-0539
Email: mfink@biologicaldiversity.org
*Applicant Pro Hac Vice*

Brian Segee (Cal. Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Tel: 805-750-8852

34

Email: bsegee@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorneys for Plaintiff*